OPINION
{¶ 1} Allan Rinzler, Harley Rinzler, Barrett Rinzler, Brenda Rinzler, Marc Mayerson, Michael Mayerson, Richard Mayerson, and Jerald Mayerson (collectively, "the individual *Page 2 
Defendants"), and RMS Realty ("RMS") appeal from a judgment of the Montgomery County Court of Common Pleas, which concluded that Everett Schafer did not have to pay $119,242 to RMS and that RMS could not reduce Schafer's capital account by $119,244. For the following reasons, the trial court's judgment is affirmed.
 {¶ 2} The underlying facts of this litigation are largely undisputed.
 {¶ 3} RMS is an Ohio general partnership. The partnership is governed by a partnership agreement executed on December 19, 1986. RMS was formed to acquire and develop a 5.2 acre piece of real estate on Springboro Pike across from the Dayton Mall. Originally, there were three general partners: Allan Rinzler ("Rinzler"), Jerald Mayerson ("Mayerson") and Everett Schafer ("Schafer"). Rinzler and Mayerson each held a 37.5% partnership interest; Schafer held a 25% partnership interest. In 1987, Rinzler transferred all of his partnership interest to his wife, Brenda. Subsequently, in December 1993 and January 1994, Brenda conveyed part of her interest to the couple's sons, Barrett and Harley. At all relevant times, Allan Rinzler remained as trustee and continued to manage the property. In 1993 and 1994, Mayerson also transferred a small part of his interest to his sons, Marc, Michael and Richard.
 {¶ 4} In 1994, RMS entered into a long-term lease with Sun TV whereby Sun would construct a 50,000 square foot building on the front four acres of RMS's property. Upon completion, RMS would reimburse Sun a maximum of $2,000,000 for the construction. Sun would then lease the building from RMS Realty for $500,000 per year for twenty years, with two five-year options.
 {¶ 5} RMS determined that it would raise the $2,000,000 through capital contributions, *Page 3 
which were due on May 3, 1995. Capital contributions are governed by section four of the partnership agreement. Under that provision, partners "shall contribute in cash a percentage of the total contribution required, equivalent to his percentage interest in the Partnership profits and losses." If a partner fails to make the required contribution, the necessary funds may be raised from the remaining partners. If the remaining partners raise the necessary funds, "the capital accounts, as adjusted, shall then be the basis for adjusting the profit and loss percentages
 {¶ 6} Prior to the call for a capital contribution, RMS's capital totaled $626,365; Schafer's capital account was $156,587, which constituted 25% of the partnership's capital. Under section four of the partnership agreement, Schafer was obligated to contribute $500,000, representing 25% of $2,000,000. Schafer was unable to raise the money, and he did not make a capital contribution. The remaining partners made the entire $2,000,000 capital contribution.
 {¶ 7} After the new capital was contributed on May 3, 1995, the partnership's total capital equaled $2,626,365. Because Schafer did not contribute, his share of the total capital decreased from 24.9993% to 5.9621% ($156,587/$2,626,365).
 {¶ 8} On September 19, 1995, Schafer filed suit against RMS, the partners, and Rinzler, asserting claims for dissolution and an accounting, breach of contract, promissory estoppel, quantum meruit, conversion, breach of fiduciary duty, fraud, negligence, intentional infliction of emotional distress, and a real estate commission.Schafer v. RMS Realty, Montgomery Case No. 1995 CV 3284 ("Schafer I
"). Prior to trial, the court granted summary judgment against Schafer on all claims except conversion, breach of fiduciary duty, and the real estate commission. *Page 4 
 {¶ 9} Beginning on July 14, 1997, the case was tried to a jury. After deliberations, the jury found in Schafer's favor on the conversion claim and awarded $695,400 in damages. By way of interrogatories, the jury specifically found that the individual Defendants converted 19% of Schafer's partnership interest, that the conversion was a proximate cause of damage to Schafer and that the amount of damages was $695,400. The jury further found that both RMS and the individual Defendants had breached their fiduciary duty by failing to disclose information and by instituting a wrongful capital call. The court did not allow the jury to decide damages on that claim. The jury also found that Schafer was entitled to an accounting. It found in favor of the Defendants on Schafer's claim for real estate commissions.
 {¶ 10} After the trial, Schafer filed various motions, including a motion for prejudgment interest and a motion for dissolution. RMS and the individual Defendants filed motions for judgment notwithstanding the verdict and for a new trial. The trial court overruled the Defendants' motions. A hearing on Schafer's motions was held before a magistrate. Subsequently, the magistrate rejected each of Schafer's motions, and the trial court adopted the magistrate's decision.
 {¶ 11} RMS and the individual Defendants appealed the trial court's judgments and Schafer cross-appealed. On June 23, 2000, we affirmed the trial court's judgments. Schafer v. RMS Realty (2000),138 Ohio App.3d 244, 741 N.E.2d 155. In our opinion, we rejected the Defendants' assertion that Schafer's action for breach of fiduciary duty was barred as a matter of law. We held that actions taken in accordance with a partnership agreement could constitute a breach of fiduciary duty if the partners have improperly taken advantage of their position in order to obtain financial gain. Id. at 273. We thus concluded that Schafer could properly bring *Page 5 
an action for breach of fiduciary duty if the defendants acted in bad faith or in a duplicitous manner by voting for and proceeding with the capital call. Id. at 274. We further concluded that the trial court did not err in overruling the motions for directed verdict and for judgment notwithstanding the verdict. We reasoned:
 {¶ 12} "Although factual disputes existed, the record contains ample evidence that the Mayerson and Rinzler interests joined together and issued a capital call in order to squeeze Schafer out of a lucrative deal, dilute his partnership interest, and take the profit for themselves. Thus, while the partnership agreement allowed the partners to vote for capital calls `as required for the purposes of the partnership,' the majority's ability in this regard was `encumbered by [the] supreme fiduciary duty of fairness, honesty, good faith, and loyalty' to their minority partner." (Citations omitted.) Id. at 278.
 {¶ 13} For the same reasons, we found that the jury's verdict on Schafer's claim of breach of fiduciary duty based on the capital call was not against the manifest weight of the evidence. We likewise found that the jury's verdict on the breach of fiduciary duty claim based on Defendants' failure to disclose information was not against the manifest weight of the evidence.
 {¶ 14} As for Schafer's conversion claim, we rejected the defendants' assertion that Ohio does not recognize claims for conversion of intangible assets. We stated: "[Conversion was an appropriate basis for recovery in the present case. Specifically, Schafer had an undisputed interest of twenty-five percent in RMS before the capital call. * * * Based on the alleged wrongful acts of the defendants, Schafer lost nineteen percent of his property interest and the defendants' asserted control over the property, in opposition to Schafer's claim." Id. at *Page 6 
285. Addressing the merits of Schafer's claim, we affirmed the jury's award of $695,400 to Schafer, stating:
 {¶ 15} "The individual defendants additionally contend in assignment of error `F that Schafer did not have a property interest that was converted because the increase in partnership assets never belonged to Schafer. According to defendants, Schafer did not pay for the building and never owned that property. Therefore, Schafer had no property interest that was converted. We reject this argument because it simply misstates the evidence.
 {¶ 16} "As we mentioned earlier, when the RMS partnership began, Schafer had a twenty-five percent interest in the only partnership asset, i.e., a 5.22-acre commercial property that was originally purchased for $800,000. Between 1986, when the property was purchased, and May 3, 1995 (the day the money for the capital call was due), the fair market value of the undeveloped property (including both the front and back parcels) had appreciated to approximately $3,660,000. Twenty-five percent of that amount is $915,000, and nineteen percent is $695,400. When Schafer's interest was diluted by about nineteen percent, on May 3, 1995, the decrease in value was, therefore, $695,400. Schafer testified that this was the total amount of his damages as of May 3, 1995. He also specifically said that he did not take the value of the building into consideration because he did not contribute to its purchase. The jury then awarded $695,400 to Schafer. Significantly, this amount did not include any increase in partnership assets caused by the construction of the Sun building ($2,000,000). Consequently, we find that defendants are being less than candid when they say that Schafer had no property interest to be converted because he did not pay for the building. We further note that no defendant put on any evidence disputing Schafer's analysis of the fair market value of the *Page 7 
property as of May 3, 1995. In fact, Rinzler's own proformas used a value of $3,000,000 for the undeveloped four-acre Sun parcel, without taking the value of the Sun building or the back parcel of land into account.
 {¶ 17} "An argument might be made that Schafer' s damages should have been offset by some amount to reflect his retention of a six-percent interest in partnership assets that were substantially increased as a result of the Sun deal. However, defendants did not file a counterclaim on this issue, did not present evidence at trial on what such an amount might be, and did not ask for a jury instruction concerning an offset to the claimed damages. In fact, as we said, defendants did not really dispute Schafer's testimony about damages during the jury trial. Therefore, while other methods of calculating damages could have been used, defendants waived this matter by failing to present any such alternatives to the trial court or to the jury. See, e.g., Crandall v.Fairborn (May 7, 1999), Greene App. Nos. 98CA0111 and 98CV0329, unreported, at 3, 1999 WL 318365 (parties may not complain on appeal about error which they induced)." Schafer, 138 Ohio App.3d at 286-287. Without going into further detail about our opinion, we overruled Defendants' remaining assignments of error, as well as Schafer's assignments of error concerning his request for an accounting, attorney fees, punitive damages, prejudgment interest, and dissolution.
 {¶ 18} On December 5, 2000, the $695,400 judgment, plus $233,007 in interest, was paid to Schafer.
 {¶ 19} On January 4, 2001, Rinzler sent Schafer a letter requesting that he pay 5.9621% of the $2,000,000 that the other partners had contributed in order to "account to the partnership for what you have gained in addition to the payment you received for your loss." Rinzler *Page 8 
explained: "The operation of the capital adjustment provision in the RMS partnership agreement assumes that a partner will not be compensated for the loss of a portion of his or her partnership interest. Indeed, the fact that you have been compensated for your loss distorts the true state of affairs of the partnership unless you contribute $119,242." The letter requested that Schafer make the payment, plus interest of $68,245.63, by January 22, 2001. Schafer did not make the requested payment.
 {¶ 20} When Schafer did not make the payment, Mayerson requested a partnership meeting. A meeting was held on April 9, 2001. After the meeting, the partnership requested Attorney Jonas Gruenberg to render a legal opinion on Schafer's obligation to make a capital contribution with respect to his retained six percent partnership interest. In correspondence dated July 30, 2001, Gruenberg informed the partnership that "Schafer can and should be required to make the approved capital contribution (plus interest) based on his retained six percent (6%) partnership interest. Any other interpretation yields a distortion of economic results and goes beyond the jury decision in the litigation." Gruenberg further recommended that if, "after review of this opinion, Mr. Schafer persists in his position[,] I recommend that the partnership file a declaratory judgment action to obtain the court's guidance and authority."
 {¶ 21} On July 31, 2001, Rinzler sent a copy of Gruenberg's letter to Schafer and reiterated the request for payment of the capital contribution plus interest. Schafer continued to dispute that he was required to make the requested payment.
 {¶ 22} On August 16, 2001, Schafer initiated the present lawsuit (Montgomery Case No. 2001 CV 4426) against the individual Defendants, RAM Group,[1] and RMS, alleging claims of *Page 9 
breach of the partnership agreement, conversion, breach of fiduciary duty, fraud, conspiracy, civil false claim/civil extortion, and conversion of profits, and seeking a declaratory judgment, preliminary and permanent injunction, dissolution of RMS, and punitive damages. RMS responded with counterclaims for breach of contract, unjust enrichment, and breach of fiduciary duty, and it further requested a declaratory judgment and an accounting. The individual Defendants and RAM Group sought the same counterclaims and relief. They also asserted additional counterclaims for indemnification, tortious interference with business relations, and abuse of process, and they sought declaratory judgments for wrongful dissolution and with regard to lis pendens.
 {¶ 23} On July 16, 2003, the defendants filed a joint motion for summary judgment and Schafer filed a motion for partial summary judgment. Defendants sought summary judgment on all of their counterclaims and Schafer's claims. Schafer sought summary judgment on all but one of the counterclaims and on his claims for breach of the partnership agreement and for a declaratory judgment that the demand that he pay 5.9621% of $2,000,000 is wrongful.
 {¶ 24} On January 22, 2004, the trial court overruled in part and sustained in part each of the motions. Central to the court's decision, the court ruled that the defendants' counterclaims that Schafer was required to pay $119,242 or, put differently, 5.9621% of $2,000,000, to RMS or to the individual defendants was barred by the doctrine of res judicata. The court denied summary judgment to all parties on Schafer's claim for breach of the partnership agreement.
 {¶ 25} The court granted Defendants' motion for summary judgment on Schafer's claims for conversion, civil extortion, lost profits, and fraud. The court overruled Defendants' *Page 10 
motion as to Schafer's claims for breach of fiduciary duty and for conspiracy, and as to his request for an injunction, dissolution of RMS, and punitive damages.
 {¶ 26} As for Defendants' counterclaims, the court granted Schafer's motion for summary judgment on defendants' claims for declaratory judgment, accounting, breach of contract, unjust enrichment, breach of fiduciary duty, indemnification, abuse of process, and tortious interference with contracts and business relationships. The court denied his motion on the counterclaim for the alleged wrongful filing of a lis pendens. The trial court indicated that Schafer had not moved for summary judgment on the individual Defendants' claim for wrongful dissolution of the partnership.
 {¶ 27} On September 20, 2005, the parties agreed that Schafer's claim for dissolution of the partnership, as well as any unresolved issues of what he would be entitled to receive upon his death or dissolution, would be tried to the court. The parties further agreed to dismiss with prejudice all other claims on which the parties had not been granted summary judgment in the court's January 22, 2004 order, but that they would retain any right of appeal with regard to the claims that had been adjudicated in the January 22, 2004 order. Schafer also agreed to execute all documents necessary to remove the lis pendens from RMS's property.
 {¶ 28} A trial on the dissolution of RMS and on Schafer's rights upon dissolution was held in September 2005. On September 26, 2006, the trial court denied Schafer's request for judicial dissolution of the partnership. The court reiterated that RMS may not reduce Schafer's capital account by $119,244, and that it may not treat the defendants' $2,000,000 capital call contributions as a loan to the partnership. The court further indicated that, upon dissolution, profits and losses should be allocated according to their partnership interest, which for Schafer, *Page 11 
at the present time, was 5.9621%.
 {¶ 29} RMS and the individual Defendants appeal, raising four assignments of error. The first two assignments concern the trial court's determination that res judicata applied, and we will address them together. The third addresses the merits of Defendants' counterclaims that Schafer was required to pay $119,242 to the partnership. The fourth addresses the court's determination regarding Schafer's entitlement to 5.9621% of the RMS capital account upon dissolution of the partnership. We will address them in turn.
 {¶ 30} I. "THE TRIAL COURT ERRED IN DETERMINING THAT SCHAFER IS NOT REQUIRED TO PAY HIS 5.9621% OF THE $2,000,000 CAPITAL CONTRIBUTION BECAUSE SUCH CLAIM IS BARRED BY THE DOCTRINE OF RES JUDICATA AND AS A COMPULSORY COUNTERCLAIM IN THE PRIOR LITIGATION"
 {¶ 31} II. "THE TRIAL COURT ERRED IN DETERMINING THAT THE CLAIMS OF THE APPELLANTS WERE RIPE IN THE PRIOR LITIGATION ON THE FALSE ASSUMPTION THAT THE APPELLANTS WERE CLAIMING THAT SCHAFER HAD TO PAY 5.9621% OF THE $2,000,000 CONTRIBUTION EVEN WHEN SECTION 4 OF THE PARTNERSHIP AGREEMENT WAS BEING APPLIED."
 {¶ 32} In their first assignment of error, Defendants assert that the trial court erred in determining that their claim for $119,242 was barred by res judicata and constituted a compulsory counterclaim.
 {¶ 33} Compulsory counterclaims are governed by Civ.R. 13(A), which provides:
 {¶ 34} "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or *Page 12 
occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon his claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13."
 {¶ 35} The Supreme Court of Ohio has set forth a two-pronged test for determining whether a claim is a compulsory counterclaim under Civ.R. 13(A): (1) does the claim exist at the time of serving the pleading, and (2) does the claim arise out of the transaction or occurrence that is the subject matter of the opposing claim. Rettig Enters., Inc. v.Koehler, 68 Ohio St.3d 274, 277, 1994-Ohio-127, 626 N.E.2d 99, citingGeauga Truck Implement Co. v. Juskiewicz (1984), 9 Ohio St.3d 12, 14,457 N.E.2d 827. "If both prongs are met, then the present claim was a compulsory counterclaim in the earlier action and is barred by virtue of Civ.R. 13(A)." Id.
 {¶ 36} Claims may also be barred by application of the doctrine of res judicata. "Res judicata is a doctrine of judicial preclusion. It states that `[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action.'"Lamar Outdoor Advertising v. City of Dayton Bd. of Zoning Appeals, Montgomery App. No. 18902, 2002-Ohio-3159, quoting Grava v. ParkmanTwp. (1995), 73 Ohio St.3d 379, 653 N.E.2d 226, paragraph one of the syllabus (emphasis added), 1995-Ohio-331. "The prior judgment must be an order or decree entered on the merits by a court of competent jurisdiction." Id., citing Norwood v. McDonald (1943), 142 Ohio St.299,52 N.E.2d 67. *Page 13 
 {¶ 37} The trial court found that Defendants' claims were barred by res judicata and were compulsory counterclaims with the following reasoning:
 {¶ 38} "The Court finds that the Defendants' assertion that the Plaintiff owes either the partnership, or the individual partners, $119,242, is barred by res judicata because it was part of the prior litigation and because it was a compulsory counterclaim in the 1995 suit. The basis of the 1995 suit was that the Defendants had wrongfully made a capital call because the Plaintiff could not contribute the percentage of the capital that was proportionate to his ownership interest. The jury found that the Defendants converted approximately 19% of the Plaintiffs partnership interest so that he was left with a 5.9621% partnership interest. The Defendants['] claim for the Plaintiff to pay a portion of the $2,000,000 capital call accrued as soon as he failed to do so, but still enjoyed the benefit without contributing his share. If the Plaintiff had not filed the 1995 suit, the Defendants would have still had a claim for the Plaintiffs share. The Defendants' claim was not dependent on the outcome of the 1995 suit. If the Court had found that the Plaintiffs 19% interest had not been converted, the Defendants were still entitled to have claimed that the Plaintiff was required to contribute his 5.9621% to the original capital call. It is of no consequence that the remaining partners paid Plaintiff for the 19% of the Plaintiffs interest at the time [of] the satisfaction of the judgment. From the moment the Plaintiff enjoyed the benefits of the partnership without making his alleged proportional contribution in May 1995, the Defendants' claim existed. Therefore, this counterclaim satisfies the first prong of the test to determine whether it is compulsory. Furthermore, the Defendants' counterclaim satisfies the second prong of the two part compulsory counterclaim test because it arises out of the same transaction as the 1995 suit. Both the 1995 suit and the Defendants' *Page 14 
counterclaim stem from the Sun TV deal and the capital contributions used in financing that project.
 {¶ 39} "The Court further notes that the Defendants could have explicitly provided for this situation by including a provision in the partnership agreement. The partnership agreement could have specified that in the event that a partner is unable or unwilling to make a required capital contribution and the other partners contributed his share of funds, then the non-contributing partner must pay his share of the capital contributions based on the re-adjusted profit and loss percentages. The agreement DOES NOT do so.
 {¶ 40} "The Court also notes that Defendants] previously argued in `the 1995 suit' the very same arguments they now raise. In their Motion for a Judgment NOV and New Trial, filed October 16, 1997, Defendants stated `the amount awarded must necessarily take into account the benefit he [Shaffer [sic]] received from the capital contributions made by the other partners, $120,000.00.[2] Thus, the jury award should be reduced by this amount based upon the uncontroverted evidence presented at trial'. Motion, supra at 4. The trial court denied the Defendant's [sic] argument for a $120,000.00 offset. Decision and Entry February 12, 1998. Thereafter, Defendants] again argued for the same offset in the Court of Appeals case #CA17673. * * *
 {¶ 41} "Therefore, Defendants DID raise the claims they now assert in their prior litigation and they were denied. Res Judicata could not be more apparent." (Footnote sic.) *Page 15 
 {¶ 42} RMS and the individual defendants assert that their claim against Schafer for the payment of $119,242 was not ripe at the time he filed his first lawsuit and, thus, was not barred by the doctrine of res judicata. In support of their assertion, Defendants cite to numerous cases, mostly from other jurisdictions, which purportedly hold that a claim is not a compulsory counterclaim if it is dependent upon the resolution of another claim. RMS does not challenge that the claim arose out of the same transaction or occurrence as the opposing claim.
 {¶ 43} Defendants assert that the trial court's application of res judicata is based, in part, on a mischaracterization of their claim. They argue that, prior to the jury's verdict, the parties had operated under section four of the partnership agreement. Under that provision, Schafer's failure to contribute pursuant to the capital contribution call resulted in a reduction of his interest in the partnership capital from roughly 25% to 5.9621%. The parties agree that, under section four, Schafer was not required to pay anything in order to be a 5.9621% owner. However, Defendants also note that Schafer "was not to be compensated for the 19% reduction in his pre-contribution interest."
 {¶ 44} Defendants state that their current claim for $119,242 arose because Schafer was paid for the 19% reduction in his ownership interest. In their view, the judgment in the 1995 action and the payment of that judgment to Schafer created a sale by Schafer of his 19% interest to the other partners. They state that the verdict on the conversion claim overrode the partnership agreement and its remedy for this situation. Thus, they assert:
 {¶ 45} "In the instant case it is abundantly clear that the Appellants' claims for the $119,242.00 did not mature or ripen until the existence of a judgment and satisfaction of that judgment in the prior litigation. In fact, under Ohio law, the remaining partners' interest in *Page 16 
Schafer's `converted' 19.0379% interest did not even vest until the satisfaction of that judgment. While it was certainlyconceivable that a claim could arise, such claim was totally dependent upon the outcome of the litigation and the satisfaction of the judgment. Until that time, the claim was indefinite and inchoate such that it was not a compulsory counterclaim by any stretch of the imagination. In fact, if judgment had ultimately been rendered in favor of theApptellants [sic] in the prior litigation, the current claims would not have matured or ripened at all.
 {¶ 46} "Again, any determination as to the actual existence of the claim could only be made upon judgment, and satisfaction of that judgment, when Schafer successfully avoided the application of the second paragraph of Section 4 of the Partnership Agreement dealing with non-contributing partners. It was only when that provision was successfully avoided by Schafer, that Schafer's obligation for his 5.9621% of the $2,000,000 capital contribution, or in the alternative, that the remaining partners became entitled to common law contribution or indemnification for that portion of the $2,000,000.00 that they had contributed on behalf of Schafer, definitively arose. Similarly, it was only at that point that the capital accounts of RMS became out of balance."
 {¶ 47} In its answer and counterclaim, RMS asserted that the payment Schafer received for the loss of his 19.0379% partnership interest in RMS created a "windfall" to Schafer in the amount of $119,242. The individual defendants likewise asserted in their answer and counterclaim that, "now that Schafer has been `compensated' for approximately 19% of his RMS interest, he has, since 1995, been a 5.9621% owner of the entire RMS assets, including the $2M capital contribution made in 1995 by the remaining partners; accordingly, Schafer now owes his 5.9621% share of the $2M contribution, totaling $119,242 plus interest from May 3, *Page 17 
1995." Defendants' counterclaims, as more fully described in their appellate brief, did not exist at the time that Schafer's complaint in the first action was filed. Clearly, unless Schafer prevailed in the first action, no claim based on the "forced sale" of his partnership interest would exist. Accordingly, Defendants' counterclaims for $119,242 do not meet the first prong of the Koehler test, and they did not constitute a compulsory counterclaim in the first action.
 {¶ 48} The question remains, however, whether the counterclaims are nevertheless barred, under the doctrine of res judicata, by SchaferI and by this court's affirmance of that judgment.
 {¶ 49} In their motion for judgment notwithstanding the verdict, Defendants claimed that the jury award of $695,400 must be offset by $120,000, arguing: "[I]t is undisputed that the Plaintiffs partners paid $2,000,000.00 for the Sun TV building through capital contributions. The Plaintiff necessarily enjoys 6% additional value of the $2,000,000.00 capital contributions, or $120,000.00."
 {¶ 50} Defendants' argument to the trial court in their motion for judgment notwithstanding the verdict did not assert that Schafer's allegedly improper "additional value" arose as a consequence of the verdict. Rather, they seem to have argued that Schafer was improperly receiving a benefit from the other's partners' $2,000,000 contribution merely because he did not contribute any money. The trial court in that case did not discuss the request for an offset in detail. Rather, it simply denied the request for a reduction in the $120,000 judgment, stating that the "jury finding on damages is supported by exhibits and testimony."
 {¶ 51} In addressing Defendants' assignments of error on appeal, we construed Defendants' argument as asserting that Schafer had no interest in the Sun TV building and that *Page 18 
he should not receive the benefit of the increased value resulting from its construction when he failed to contribute to it. As we quoted above, the individual defendants asserted in that appeal that "Schafer did not have a property interest that was converted because the increase in partnership assets never belonged to Schafer. According to defendants, Schafer did not pay for the building and never owned that property. Therefore, Schafer had no property interest that was converted." With regard to damages specifically, we stated that Defendants failed to raise a counterclaim, argue at trial, or request a jury instruction for reduced damages "to reflect his retention of a six-percent interest in partnership assets that were substantially increased as a result of the Sun deal."
 {¶ 52} The trial court in the present case construed their argument as asserting that Schafer should not benefit from the construction of the building, which was financed by the $2,000,000 contribution of his partners, when he did not contribute to the capital call. The trial court's decision September 26, 2006, which addressed Defendants' motion to reconsider the application of res judicata, supports the conclusion that Defendants' claim in the first action was that Schafer's damages were too high. The nature of the claim was clearly illustrated by the trial court, as follows:
 {¶ 53} "Plaintiff s evidence in that prior trial was that the cumulative value of RMS real estate at the time of the capital call was $3,660,000.00. Plaintiff lost 19% (25% to 6%) of the partnership, or 19% of $3,660,000.00, which equals the $695,400 the jury awarded. The problem with using this method to calculate Plaintiff s conversion damages is that it does NOT compare what Plaintiff lost with what Plaintiff had left after the 1995 capital call. Before the capital call the plaintiff had 25% of $3,660,000.00, or $915,000.00. After the capital call *Page 19 
$2,000,000.00 infusion, the total value of RMS was $3,660,000.00 plus the $2,000,000.00, or $5,660,000.00. Plaintiff s interest after the capital call was then 6% of $5,660,000.00 which is $339,600.00. Therefore, Plaintiff s interest went from a value of $915,000.00 to $339,600.00, for a loss of $575,400.00, not the $695,400.00 which was awarded. That $575,400.00 amount of loss is precisely $120,000.00 less than the $695,400 the jury actually awarded. * * *"
 {¶ 54} As concisely summarized by the trial court in its September 26, 2006 decision, Defendants' requested offset in the first action was based on their belief that Schafer should not benefit from the appreciation of the building that resulted from the construction of the Sun TV building when he did not contribute to it. We agree with the trial court that Defendants are barred from raising that claim again.
 {¶ 55} We disagree with the trial court, however, in its conclusion that the $119,242 counterclaim in this action is the same as the claim for a $120,000 (rounded) offset presented in Schafer I. The counterclaim asserted in this action alleges that the verdict on the conversion action created a "forced sale" of Schafer's 19% interest in the partnership and resulted in an imbalance in the partnership accounts, and that Schafer must now pay $119,242 to retain his 5.9621% interest. In our view, the present counterclaims were not — and could not have been-raised in the prior action.
 {¶ 56} Accordingly, the trial court erred in finding that Defendants' counterclaims for $119,242 were barred by res judicata and as a compulsory counterclaim. However, in light of disposition of the third assignment of error, infra, we find the trial court's error to be harmless.
 {¶ 57} The first and second assignments of error are overruled.
 {¶ 58} III. "THE TRIAL COURT ERRED IN NOT REQUIRING SCHAFER TO PAY *Page 20 
HIS 5.9621% SHARE OF THE $2,000,000 CAPITAL CONTRIBUTION FOR THE SUN TV BUILDING, PLUS INTEREST FROM MAY 3, 1995, OR, IN THE ALTERNATIVE, TO REIMBURSE THE INDIVIDUAL DEFENDANTS IN A LIKE AMOUNT FOR HAVING MADE HIS SHARE OF THE CONTRIBUTION."
 {¶ 59} In their third assignment of error, Defendants assert that the trial court erred in not granting summary judgment to them on their claim for $119,242. Again, they argue that the payment of the judgment on the conversion claim "created an imbalance within the capital accounts of RMS" and that Schafer should be required to pay $119,242 "in order to continue receiving 5.9621% of the profit distribution and that share of the capital account ($119,242) upon dissolution." Although the trial court initially rejected Defendants' arguments on res judicata grounds, it expounded on that ruling in its September 26, 2006 judgment and found Defendants' arguments to be without merit. As set forth below, we agree with the trial court.
 {¶ 60} To understand Defendants' arguments, a reiteration of capital adjustments is beneficial. Rinzer provided these calculations to Schafer in his August 13, 2001 correspondence.
 {¶ 61} The parties do not dispute that Schafer originally held a 25% interest in the partnership. The following table indicates the relative capital accounts of the partners prior to the capital call and the litigation between the parties.

Name Capital Account Percentage
Harley Rinzler $31,319 5.0
Barrett Rinzler $31,319 5.0
 *Page 21 
Brenda Rinzler $172,251 27.5
Michael Mayerson $31,319 5.0
Richard Mayerson $31,319 5.0
Marc Mayerson $31,319 5.0
Jerald Mayerson $140,932 22.5
Everett Schafer $156,587 24.9993
TOTAL: $626,365 100%

 {¶ 62} The parties also do not dispute that, after the capital contribution call on May 3, 1995, Schafer's ownership interest was reduced to 5.9621% in accordance with section 4 of the partnership agreement, as indicated below.
Name Capital New Capital Balance
 Contribution Percentage
Harley Rinzler $133,333 $164,652 6.2692
Barrett Rinzler $133,333 $164,652 6.2692
Brenda Rinzler $733,334 $905,585 34.4806
Michael Mayerson $133,334 $164,652 6.2692
Richard Mayerson $133,333 $164,652 6.2692
Marc Mayerson $133,333 $164,652 6.2692
Jerald Mayerson $600,000 $740,932 28.2113
Everett Schafer $0 $156,587 5.9621
TOTAL: $2,000,000 $2,626,365 100%

 {¶ 63} Although Schafer's capital account balance after the capital call represented a 5.9621% partnership interest, Defendants assert that the jury verdict on Schafer's conversion claim in the first litigation "overrode" the application of Section 4 of the partnership agreement and resulted in a forced sale of 19.0379% of Schafer's 25% ownership interest to the other partners. In other words, Defendants assert that they purchased 76.1516%, or $119,244, of Schafer's interest in the partnership when they paid the judgment. This amount was calculated as: $156,587 (25% interest)-$37,343 (5.9621% interest) = $119,244 (19.0379% interest purchased).[3]
 {¶ 64} In accordance with Defendants' claim that they purchased 76.1516% of Schafer's partnership interest, Defendants contend that Schafer's capital account needed to be reduced by $119,244 to reflect that purchase. The partnership thus reduced Schafer's capital account by $119,244 and reallocated that money to the partners in proportion to their interests, as follows:
Name Capital New Capital Balance
 Adjustment Percentage
Harley Rinzler 7,950 172,602 6.5719
Barrett Rinzler 7,950 172,602 6.5719
 *Page 23 
Brenda Rinzler 43,723 949,308 36.1453
Michael Mayerson 7,950 172,602 6.5719
Richard Mayerson 7,950 172,602 6.5719
Marc Mayerson 7,950 172,602 6.5719
Jerald Mayerson 35,771 776,703 29.5733
Everett Schafer (-119,244) 37,343 1.4219
TOTAL: 2,626,365 100%

The result of this capital adjustment was that, although Schafer was a 5.9621% owner, Schafer's capital balance was no longer 5.9621% of the partnership's total capital. As stated by Defendants, the accounts were now "out of balance." According to Defendants, in order for Schafer to retain a 5.9621% interest, he would need to repay the other partners $119,242. This is the amount that the other partners paid for Schafer in response to the capital call, and this amount would then be deducted from the other partner's capital accounts.
 {¶ 65} Although Rinzler's charts of the capital balance adjustments illustrate the purchase of Schafer's partnership interest after the capital call, Defendants' arguments may be more easily understood by considering the "purchase" to have occurred just prior to the capital contributions. Stated simply, Defendants argue that, when they purchased 19.0379% of Schafer's 25% interest, Schafer agreed to be a 5.9621% owner — with a capital balance of $37,343 — at the time of the capital call. Thus, Schafer was required to contribute 5.9621% of $2,000,000, which amounts to *Page 24 
$119,242. Because Schafer has failed to pay in accordance to the capital call, his capital balance of $37,343 is "out of balance" with his 5.9621% ownership interest. Defendants argue this can only be remedied by Schafer's payment of $119,242.
 {¶ 66} Defendants' capital adjustment of $119,244 is premised on the assumption that the jury verdict "overrode" section 4 of the partnership agreement and that the payment of the judgment for conversion constituted a forced sale of Schafer's 19.0379% interest, which the jury determined had been converted by Defendants.
 {¶ 67} As Defendants correctly state, a judgment for conversion generally imposes the fiction of a "forced judicial sale" and requires the defendant to pay the full value of the converted property.Acheson v. Miller (1853), 2 Ohio St. 203; Conley v. Caudill, Pike App. No. 02CA697, 2003-Ohio-2854, ¶ 8 n. 2. As stated in Acheson: "The party [plaintiff] in effect abandons his property, as of that time, to the wrong-doer, and proceeds for its value; so that, when judgment is obtained and satisfaction made, the property is vested in the defendants, by relation, as of the time of the taking or conversion." See, also, Shorey v. Martin (July 2, 1998), Cuyahoga App. No. 72802. Damages for conversion are thus determined by the value of the property at the time of the conversion. Fisher v. Barker, 159 Ohio App.3d 745,2005-Ohio-1039, 825 N.E.2d 244, ¶ 10.
 {¶ 68} We disagree with Defendants' application of the foregoing authority. While a judgment in Schafer's favor on his conversion claim resulted in a relinquishment of his right to the 19.0379% interest in the partnership that he had previously held, the judgment did not override section 4 of the partnership agreement nor did it result in an actual sale of Schafer's 19.0379% interest to his other partners. *Page 25 
In short, Schafer's decrease from a 25% interest to a 5.9621% interest pursuant to section 4 remained effective. This decrease is what section 4 contemplated when a partner failed to make a capital contribution. As stated by the trial court, the partnership agreement does not require partners to make a capital contribution in the amount of their decreased interest after the application of section 4.
 {¶ 69} Defendants assert that "Treasury Regulations of the Internal Revenue Service require that the portion of Schafer's capital account attributable to the 19.0379% transferred interest also be transferred to Schafer's partners. This represents what Schafer's partners bought. When a partner sells a portion of his partnership interest, he sells his portion of his capital account as reflected on the books of the partnership. Thus, the $119,244 of Schafer's capital account was property transferred in accordance with the Treasury Regulations and the partnership agreement * * *."
 {¶ 70} Treas. Reg. 1.704-1(b)(2)(iv)(l) governs transfers of partnership interests. It provides, in relevant part:
 {¶ 71} "The capital accounts of the partners will not be considered to be determined and maintained in accordance with the rules of this paragraph (b)(2)(iv) unless, upon the transfer of all or a part of an interest in the partnership, the capital account of the transferor that is attributable to the transferred interest carries over to the transferee partner. (See paragraph (b)(2)(iv)(m) of this section for rules concerning the effect of a section 754 election on the capital accounts of the partners.) * * *." 26 C.F.R. 1.704-1.
 {¶ 72} In our view, Treas. Reg. 1.704-1(b)(2)(iv) is a red herring. As Defendants *Page 26 
stated in their motion for summary judgment: "Again, Schafer remains a5.9621% RMS partner. However, certain computations were made for taxreporting purposes that benefitted all the partners, including Schafer."
 {¶ 73} The $695,400 in damages that the individual defendants were required to pay were tort damages. By paying the judgment, Defendants compensated Schafer for the 19.0379% interest that he lost due to thewrongful capital contribution call, which the jury found constituted a breach of the other partners' fiduciary duty to him. In return, Defendants were entitled to retain their portion of the 19.0379% interest that Schafer lost due to the wrongful capital call. Stated simply, the payment of the judgment should have had no effect on the capital accounts of the partners. As aptly stated by the trial court:
 {¶ 74} "The * * * fundamental flaw with the Defendants' position is that THE JUDGMENT PAYMENT OF THE $695,400 TO THE PLAINTIFF WAS NOT, IS NOT, AND SHOULD NOT BE TREATED AS A CONTRIBUTION OF CAPITAL TO THE PARTNERSHIP. The money was paid to Plaintiff, not the partnership. It may well be that for tax basis purposes there has been a shift in tax basis from the Plaintiff to Defendants for the portion of Plaintiff's interest that was converted, but that tax basis calculation is different from the partnership `capital account' designed to be a reflection of the various partners' interests."
 {¶ 75} To construe the damages payment as a sale, as Defendants propose, would not only allow Defendants to engage in wrongful conduct with near impunity but would permit Defendants to reap an additional benefit from their wrongful conduct. Schafer's partnership interest dropped from 25% to 5.9621% as a result of the capital *Page 27 
call. Had the jury concluded that this capital call was in accordance with Defendants' fiduciary duty to Schafer, he would have remained at 5.9621% without requiring additional capital contributions from him. Under Defendants' theory, their payment of value for 19.0379% of Schafer's partnership interest would leave Schafer with a 1.4219% partnership interest, assuming that Schafer did not make any additional capital contribution pursuant to the capital call. (We again acknowledge that Defendants have repeatedly agreed that Schafer is a 5.9621% owner of the partnership. However, that concession appears to be coupled with the assertion that the books are now "out of balance" and can only be remedied by an additional $119,242 contribution by Schafer.) Schafer should not be worse off after receiving a judgment in his favor against Defendants, and Defendants should not reap an additional 4.47% benefit from their wrongful conduct.
 {¶ 76} In short, Defendants had no reasonable basis to make the $119,244 capital adjustment. Schafer was entitled to retain the entirety of his $156,587 capital investment. We find that the trial court's decision of September 26, 2006 nicely articulates our rationale:
 {¶ 77} "* * * Plaintiff enjoys 5.9621% of the profits (or losses) of the partnership, including the assets and profits of the partnership attributable to the two million dollar capital call in which he did not participate. However, 5.9621% is Plaintiff's adjusted percentage of interest calculated according to the partnership agreement capital adjustment provision * * *. [Allowing Defendants to reduce Plaintiff's `capital account' by $119,244 will have a disastrous effect on Plaintiff's investment by reducing Plaintiff's percentage of total capital and increasing the other partners' percentage of *Page 28 
the total capital. In that event, routine profit distributions, made at Plaintiffs 5.9621% rate of profit/loss percentage, would disproportionately further reduce the Plaintiffs `capital account.' Plaintiffs eventual distribution upon dissolution will be substantially reduced or even non-existent. Essentially, the Court distinguishes the `capital account' in the partnership agreement for reflection of partners' interest in the partnership, from the adjusted tax basis `capital account' for the partners to determine their taxable income or loss. The latter was affected by the Defendants' conversion of partnership interest, the former was not."
 {¶ 78} The third assignment of error is overruled.
 {¶ 79} IV. "THE TRIAL COURT ERRED IN DETERMINING THAT SCHAFER IS ENTITLED TO 5.9621% OF THE RMS CAPITAL ACCOUNT UPON DISSOLUTION OF THE PARTNERSHIP, INCLUDING 5.9621% OF THE $2,000,000 THAT HE DID NOT CONTRIBUTE."
 {¶ 80} In their fourth assignment of error, Defendants claim that the trial court erred in determining that Schafer was entitled to 5.9621% of the RMS capital account upon dissolution. They argue that Schafer should not receive $119,244, which he did not contribute, upon dissolution.
 {¶ 81} In addressing Schafer's rights upon his death or the dissolution of the partnership, the trial court ruled:
 {¶ 82} "According to the partnership agreement, upon dissolution, after the payment of RMS Realty's creditors and payment of any indebtedness or obligations to the partners, the assets of RMS Realty shall be applied to the payment of the partners to the extent of their capital accounts, which are adjusted to reflect the gain or loss *Page 29 
allocated upon the sale of the partnership property. In other words, if upon dissolution RMS Realty's property is sold at a profit, the profit is allocated to the partner's capital accounts according to each partner's partnership interest. Therefore, 5.9621% of the profit would be allocated to Plaintiff's capital account. The capital accounts are adjusted again to reflect payment of the partnership debt owed to creditors and partners (other than capital and profits) with each partner discharging the obligations equal to his partnership interest. Therefore, Plaintiff's capital account will be adjusted to reflect a payment of 5.9621% of the aforementioned partnership debt. Last, the partners will receive a payment to the extent of their respective final capital accounts. The Court adopts, by way of example, the prospective distributions testified to by Attorney Caspar at Plaintiff's Exhibit 124, Bates pages 840 and 850."
 {¶ 83} Defendants assert that allowing Schafer to receive, upon dissolution, 5.9621% of the $2,000,000 contributed by his partners is an "unjust windfall," unless Schafer makes such a contribution. In essence, Defendants make the same basic argument as in their third assignment of error, i.e., that Schafer must make a capital contribution of $119,242.
 {¶ 84} Our disposition of the third assignment of error resolves this assignment of error as well. Because Schafer's 5.9621% partnership interest is a result of his failure to contribute to the capital call, in accordance with section 4 of the partnership agreement, Schafer need not contribute any additional funds to be entitled to 5.9621 % of the partnership assets upon dissolution. We find no error in the trial court's ruling.
 {¶ 85} The fourth assignment of error is overruled.
 {¶ 86} The judgment of the trial court will be affirmed. *Page 30 
FAIN, J. and DONOVAN, J., concur.
[1] RAM Group is a different partnership of Rinzler and Mayerson.
[2] Although the amount stated was $120,000 (calculated as 6% of $2,000,000) this figure was actually referring to the same $119,242 claimed herein. Shafer's actual partnership interest of 5.9621% had been rounded off to 6% in Defendant's argument.
[3] As noted by the trial court, the difference between $119,244 and $119,242 can be explained by different methods of rounding by Defendants. *Page 1